UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BNSF RAILWAY COMPANY, ET AL.,<br><br>Plaintiffs,<br><br>v.<br><br>CALIFORNIA STATE BOARD OF EQUALIZATION, et al.,<br><br>Defendants. | Case No. 16-cv-04311-RS<br><br>**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION** |

## I. INTRODUCTION

The State of California enacted a law—referred to by the parties as "SB 84"— and has promulgated regulations thereunder, to impose a $45 charge for each railway car loaded in, or crossing into, the state that carries any quantity of 25 specifically identified "hazardous materials," including such substances as diesel fuel, ethanol, gasoline, chlorine, and crude oil. Although the charge is to be paid by the owner of the hazardous material—the shipper—the law and regulations require railroads to collect the fees and remit them on a quarterly basis to the state Board of Equalization. The charges are to go into effect next month.

Plaintiffs BNSF Railway Company and Union Pacific Railroad Company ("the Railroads") seek a preliminary injunction prohibiting the state from further implementing or enforcing the charge, contending the state law is impermissible for several reasons. First, the Railroads argue SB 84 is preempted by the Interstate Commerce Commission Termination Act of 1995 ("ICCTA"), Pub. L. No, 104-88, 109 Stat. 803, which they contend provides for exclusive federal

jurisdiction over "rates," "practices," and "services" of rail carriers. Second, the Railroads argue SB 84 violates the federal Hazardous Materials Transportation Act ("HMTA"), 49 U.S. Code §§ 5101 *et seq*, which permits the imposition of fees related to the transportation of hazardous materials, but only if "fair." The Railroads insist this fee is *not* fair because it discriminates against rail transport and also purportedly contravenes the Dormant Commerce Clause. Finally, the Railroads argue that if the charge is construed as a tax rather than a fee (and they contend there is a substantial argument for doing so), then it is "plainly forbidden" by the Railroad Revitalization and Regulatory Reform Act of 1976 (the "4-R" Act), Pub. L. No. 94-210, 90 Stat. 31.

Because the Railroads have shown a likelihood of success on the merits as to some of these arguments and that the other prerequisites for preliminary relief have been satisfied, their motion will be granted.

## II.  BACKGROUND

SB 84, enacted in 2015, required California's Governor's Office of Emergency Services ("OES") to establish a schedule of fees "to be paid by each person owning any of the 25 most hazardous material commodities . . . that are transported by rail in California . . . ." Cal. Gov't Code § 8574.32(a)(1). The fee purportedly reflects the cost of providing specific benefits to the owners of hazardous materials being shipped by rail, including preparations to respond to the release of hazardous materials from a rail car, efforts to contain the resulting damage and restore the use of the railroads for the owners of the hazardous materials, and mitigation of potential exposure of those owners to compensable damages. *Id*. § 8574.32(c).

The fee is to be based on the number of rail cars loaded with hazardous materials being transported within California. *Id*. § 8574.32(b)(2). Railroads are responsible for collecting the fee from the shipper and passing it on to the Board of Equalization. *Id*. § 8574.32(b)(2), (4). The fees are then to be placed in the Regional Railroad Accident Preparedness and Immediate Response Fund ("the Fund"). *Id*. § 8574.44(a), (b). After reimbursement to another state fund that provided

1  start-up costs for this program, the fees may then be used on appropriation by the Legislature for
2  specified purposes related directly to the release of hazardous materials being transported by rail.
3  *Id*. § 8574.44(d), (e). Those purposes include planning, developing, and maintaining a capability
4  for responding to large-scale hazardous materials accidents involving rail cars; acquiring and
5  maintaining specialized equipment and supplies; and creating and supporting specialized, regional
6  training facilities and emergency response teams. *Id*. § 8574.44(e).

7  If equipment acquired with fee revenue is used for emergency response services unrelated
8  to railroad accidents, the law requires reimbursement to the Fund. *Id*. § 8574.44(i). The total fees
9  collected during the 2016 and 2017 calendar years are not to exceed $20 million per year. *Id*. §
10 8574.44(g)(1), (2). During the 2018 calendar year, the total fees are limited to $10 million. *Id*. §
11 8574.44(g)(3)(A).

12 No less frequently than every three years, the director of OES is to reconsider and adjust
13 the fee "with due consideration for existing and expected operational and continued resource
14 requirements." *Id.* § 8574.32 (h)(1). Total fees are not to exceed the reasonable costs incurred for
15 the purposes identified in the statute. *Id*. § 8574.32(d). As noted above, regulations have set the
16 current fee at $45 per rail car.

17 OES's notice of emergency rulemaking asserts the fee is intended to reduce the likelihood
18 of devastating harm resulting from the transportation of hazardous materials by rail. The state
19 contends the fee will advance that purpose "by eliminating one of the greatest 'gaps' in
20 California's emergency response system."

### III.   LEGAL STANDARDS

An application for preliminary relief requires the plaintiff to "establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. N.R.D.C., Inc.*, 555 U.S. 7, 21-22 (2008). The Ninth Circuit has clarified, however, that courts in this Circuit should still evaluate the likelihood of success on a "sliding scale." *Alliance*

*for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134 (9th Cir. 2011) ("[T]he 'serious questions' version of the sliding scale test for preliminary injunctions remains viable after the Supreme Court's decision in *Winter*."). As quoted in *Cottrell*, that test provides that, "[a] preliminary injunction is appropriate when a plaintiff demonstrates . . . that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor," provided, of course, that "plaintiffs must also satisfy the other [*Winter*] factors" including the likelihood of irreparable harm. *Id*. at 1135.

## IV. DISCUSSION

### A. Preemption under the ICCTA

The ICCTA is a "federal act that substantially deregulated the railroad industry." *Ass'n of American Railroads v. S. Coast Air Quality Mgmt. Dist.*, 622 F.3d 1094, 1096 (9th Cir. 2010). It contains an "express preemption provision over regulation of rail transportation." *Id.*

> The jurisdiction of the [Surface Transportation] Board over—
>
> (1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and
>
> (2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State, *is exclusive*. Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation *are exclusive and preempt the remedies provided under Federal or State law.*

49 U.S.C. § 10501(b) (emphasis added).

In *American Railroads*, plaintiffs in this case (together with another co-plaintiff) successfully argued the ICCTA preempted a local California governmental agency's rules aimed at limiting the air pollution created by idling trains. *See* 622 F.3d at 1098. Quoting Third Circuit precedent, the *American Railroads* court observed that the ICCTA, "preempts all state laws that

may reasonably be said to have the effect of managing or governing rail transportation." *Id.* (quoting *N.Y. Susquehanna & W. Ry. Corp. v. Jackson*, 500 F.3d 238, 252 (3d Cir. 2007)).

If the subject matter of SB 84 did not implicate the HMTA, as discussed in the following section, it would be simple to conclude that the broad scope of ICCTA preemption is sufficient to disempower California from imposing fees such as those mandated by SB 84 and its implementing regulations.[1] The HMTA, however, expressly authorizes state and local entities to enact fees "related to transporting hazardous material," provided certain requirements are met. *See* 49 U.S.C. § 5125(f) ("A State, political subdivision of a State, or Indian tribe may impose a fee related to transporting hazardous material only if the fee is fair and used for a purpose related to transporting hazardous material, including enforcement and planning, developing, and maintaining a capability for emergency response."). The question, therefore, is determining how to reconcile the express power given to states and local entities under the HMTA with the preemptive aspects of the ICCTA. The parties are in agreement that the two statutes can and should be "harmonized." *See American Railroads*, 622 F.3d at 1097 ("If an apparent conflict exists between ICCTA and a federal law, then the courts must strive to harmonize the two laws, giving effect to both laws if possible.")

The Railroads insist harmonizing the two statutes is an "easy task" because, they contend, the HMTA requirement that any fee be "fair" is sufficient to accommodate the interests reflected in "overlapping" statutes such as the ICCTA. The Railroads acknowledge that the state may collect a "'fair' hazmat fee"— they argue that in doing so the state simply must not "intrude on the carrier-shipper relationship, and may not discriminate against rail in favor of other modes of transportation." In the Railroads' view, therefore, The ICCTA and the HMTA are "capable of coexistence."

California, in turn, argues the two statutes are not in conflict because the specific

---

[1] California does not concede this point, and offers a number of arguments as to why, in its view, ICCTA preemption would not apply even in the absence of the HMTA.

authorization given by the HMTA for states to impose fees related to transporting hazardous material controls over any preemptive effect the more general ICCTA otherwise might have. As the Railroads point out, though, this "harmonization" of the two statutes does little more than argue the ICCTA can be disregarded and the HMTA applied.

At this juncture, the Railroads have presented the more persuasive argument that ICCTA preemption precludes the state from imposing fees in the manner contemplated by SB 84. Assuming a fee for transporting hazardous materials otherwise complies with the HMTA, nothing in the ICCTA would preclude a state or local entity from imposing it directly on shippers, or on railroads themselves.   The problem with the scheme of SB 84 is that it seeks to compel railroad companies to collect the fees from shippers, on behalf of the state.  Structured in that manner, SB 84 fees become part of the "rates" charged by the railways to their shippers.  Theoretically, any disputes regarding the calculation and collection of those fees would have to be under the jurisdiction of the federal Surface Transportation Board—a result that demonstrates why preemption must apply, as it is not for the state effectively to instruct that entity as to what must be included in rail shipping charges.   Accordingly, the Railroads have established a likelihood of success—or at the very least, serious questions on the merits—with respect to their claim that SB 84 is preempted by the ICCTA.[2]

B.  The HTMA

As set out above, the HMTA expressly authorizes state and local authorities to "impose a fee related to transporting hazardous material only if the fee is fair and used for a purpose related to transporting hazardous material, including enforcement and planning, developing, and maintaining a capability for emergency response." 49 U.S.C. § 5125(f)  There is no genuine

---

[2] The Railroads contend the ICCTA also preempts SB 84 because it discriminates against rail transportation in favor of trucking.  The parties are in substantial agreement that *if* SB 84 unfairly discriminates between rail and trucking, it is impermissible under either the ICCTA or the HMTA, or both.  The parties' dispute lies in whether any such unfair discrimination exists, and will be discussed below.

dispute that, on its face, the fee imposed under SB 84 and implementing regulations falls within this statutory authority—as long as it is "fair." The Railroads offer two basic arguments as to why the fee is not fair, in their view.

*1. Rail v. Trucking*

First, the Railroads argue SB 84 unfairly discriminates as between rail transportation and truck transportation. The Railroads proffer evidence that while nationally, railroads and trucks carry roughly equal amounts of hazardous materials, "as measured by ton-mileage," trucks experience approximately 15-20 more "hazardous material incidents" than railroads do.[3] The Railroads assert the California Legislature declined to adopt a different bill—AB 102—that would have applied the hazardous material fee scheme to both railroads and motor carriers. The Railroads also advance evidence to show that notwithstanding the apparently small dollar amount of the fee per rail car, the charge will drive at least some shippers to choose truck over rail transport.

California does not, and could not, argue SB 84 encompasses more than railroads. The state argues instead that there is "ample justification" for SB 84's focus on rail transport. California contends the bill passed in response to specific concerns about its ability to respond to a rail spill involving hazardous materials. California argues a single train can carry far more hazardous material than a truck, and that therefore the potential impact of a derailment or other rail

---

[3] Neither this motion nor this action requires or permits the Court to assess definitively the relative safety of truck and rail transport. It is self-evident that a legislature might have to balance many competing issues in addressing the risks posed by each mode of transport. For example, even if truck accidents are more frequent, it might be the case that train accidents often result in larger releases of hazardous materials. Or, regardless of frequency and size of incidents, it is conceivable that preparing for rail accidents presents challenges greater than those presented by trucking accidents, given that emergency vehicles may more often have access to highway locations than to rail locations. The record permits a determination that there is a rational basis for addressing the risks of rail and truck transport separately; legislative priorities, however, are beyond the scope of the issues properly presented here. The validity of the law does not turn on whether it has a rational basis, but whether it is permissible given the preemptive effect of the ICCTA and the limitations of the HMTA and the Dormant Commerce Clause.

accident "dwarfs" the threat posed by an accident involving a truck.  California reports its policy advisors concluded the current emergency response system for releases of hazardous materials along rail routes (particularly in remote areas) was inadequate, but that no similar risks were identified for the transportation of hazardous material by truck.

Nevertheless, California has not shown that it is consistent with the fairness requirement of the HMTA for it to impose a fee that distinguishes between the *modes* of hazardous material transportation.   This is particularly so given that the law on its face contemplates that at least some, if not all, of the spill response resources to be funded by the fees will be equally useful in addressing trucking accidents.  Even though the Fund must be reimbursed, as the Railroads point out, merely requiring reimbursement of equipment operating expenses does not excuse saddling the rail industry with the cost of acquiring equipment that very well could be used by the trucking industry as much or more than by the rail industry.

### 2.  *Interstate v. Intrastate*

The Railroads further argue SB 48 is discriminatory because it has the potential effect of burdening interstate commerce.  As such, the Railroads contend, the law both violates the fairness requirement of the HTMA and the Dormant Commerce Clause.  The Railroads' theory is that because the $45 fee is imposed without respect to where or how far the rail car is traveling, it violates the "internal consistency" test that asks whether if, other states imposed similar laws, it would favor intrastate over interstate commerce.  *See Am. Trucking Associations, Inc. v. Scheiner*, 483 U.S. 266, 282–84 (1987).  The Railroads point that if California's neighboring states enacted an identical law, then a 400 mile trip within California borders would be less costly than the same length journey that crossed state lines.

As *Scheiner* explains, "the Commerce Clause is not offended when state boundaries are economically irrelevant." *Id.* at 283.  Thus, "even if more than one jurisdiction applies a charge to participants in interstate commerce, the Commerce Clause may be satisfied if the revenue measures maintain state boundaries as a neutral factor in economic decisionmaking." *Id.*  As a

result, taxes or fees that apply based on mileage traveled within a state, for example, are valid.  In contrast, however, "[i]f each State imposed flat taxes for the privilege of making commercial entrances into its territory, there is no conceivable doubt that commerce among the States would be deterred." *Id.*

SB 84, while imposing a fee, not a tax *per se*, is exactly that.  A flat cost is imposed on every rail car containing the specified hazardous materials that enters California, regardless of the distance traveled within the state.  Accordingly, the Railroads have shown a likelihood of success of prevailing on their claim SB 84 is not "fair" as required by the HMTA and that it violates the Dormant Commerce Clause.

### C. The 4-R Act

The Railroads' initial argument is that SB 84 imposes a "fee," which they contend is invalid, as discussed above.  Alternatively, however, the Railroads contend that "if" the $45 charge imposed under SB 84 should more properly be characterized as a "tax," then it should be enjoined under the 4-R Act, which undisputedly prohibits states from enacting taxes that "discriminate against a rail carrier."   49 U.S.C. § 11501(b)(4).  California does not dispute that if the charges imposed by SB 84 are appropriately characterized as a tax, they would not be permissible.  *See*, *Kansas City S. Ry. Co. v. Koeller*, 653 F.3d 496, 510 (7th Cir. 2011) ("It is now well established that a showing that the railroads have been targeted is enough to prove discrimination" under the 4-R Act.); *see also Dep't of Revenue of Or. v. ACF Indus., Inc.*, 510 U.S. 332, 346-47 (1994) (if only railroads were subject to a tax, "one could say that the State had singled out railroad[s] . . . for discriminatory treatment"); *Burlington N. R.R. Co. v. City of Superior*, 932 F.2d 1185, 1187 (7th Cir. 1991) (railroad made irrebuttable showing of discrimination "simply by proving that [a] tax was imposed on an activity . . . in which only a railroad engages").

The Railroads suggest the Court need not "definitively classify" the SB 84 charge as either a fee or a tax "especially in this preliminary proceeding."  The Railroads nonetheless point to the

three-factor test articulated in *Bidart Bros. v. Cal. Apple Comm'n*, 73 F.3d 925 (9th Cir. 1996) to argue there is a "substantial argument" for treating the SB 84 charge as a tax. The Railroads emphasize the third factor identified in *Bidart* and argue that the funds collected here should be seen as "expended for general public purposes" rather than "used for the regulation of benefit of the [rail industry]." Although SB 84 plainly has purposes intended to benefit the general public, the Railroads have made no serious showing that the fees imposed under SB 84 were designed to "raise general revenues" and can properly be characterized as a tax. Accordingly, the Railroads have not established a likelihood of success on a claim that SB 84 is preempted by the 4-R Act.

### D. <u>Irreparable harm, balance of equities, and public interest</u>

The Railroads have made an adequate showing that they will suffer irreparable harm if required to begin collecting the SB 84 fees during the pendency of this action. Although the fees themselves likely could be recovered by the shippers (or perhaps by railroads on behalf of their shippers) if the fees take effect and the law is later ruled invalid, the Railroads have established that the fees will drive at least some business to trucking—damages that they will not be able to recover against the State.

If the fees collection does commence, conversely, the Fund will begin to accumulate. As time passes, the Legislature will eventually be able to appropriate the monies to fund acquisition of response equipment and training. If monies do not begin flowing to the Fund during the pendency of this litigation, therefore, there is at least some theoretical risk that a future accident will occur at some date when the State will have fewer resources to respond, than it would have had in the absence of an injunction. That speculative and attenuated risk, while not trivial, does not outweigh the harm and inequity to the Railroads in the absence of preliminary relief. Additionally, the public interest does not weigh against such relief. Accordingly, the motion will be granted.

V.

The Railroads' motion is granted. The Railroads shall submit a proposed form of injunction, approved as to form by defendants. The Initial Case Management Conference is hereby continued until January 19, 2017.

**IT IS SO ORDERED**.

Dated: October 28, 2016

_____
RICHARD SEEBORG
United States District Judge